UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 3, 2016

------------------------------------------------------------X
SIMMTECH CO., LTD.,                            :
                                               :
                          Plaintiff,           :          13-cv-6768 (KBF)
                                               :
                                               :          OPINION & ORDER
            -v-                                :
                                               :
                                               :
CITIBANK, N.A., CITIGROUP, INC.,               :
CITIBANK OVERSEAS INVESTMENT                   :
CORPORATION, CITICORP HOLDINGS, and            :
CITIGROUP GLOBAL MARKETS, INC..,               :
                                               :
                          Defendants.          :
                                               :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

Plaintiff Simmtech, a Korean company, brings this action against defendants (collectively, "Citigroup"), corporate entities comprising a large international banking institution, alleging, inter alia, that defendants used its Korean subsidiary ("CKI") to sell plaintiff a financial product that led to significant losses for plaintiff while enriching defendants.

Simmtech is an exporter who receives payment in U.S. Dollars and must convert those payments into Korean Won. In this action, Simmtech alleges that in the period leading up to 2006, it became concerned about the risk of the U.S. Dollar depreciating against the Korean Won. It alleges that defendants, acting through CKI, induced plaintiff to enter into risky options contracts that did not in fact provide an appropriate hedge against the risk of U.S. Dollar depreciation and

instead exposed plaintiff to more risk.  Plaintiff alleges that it sustained over $73 million dollars in losses between 2008 and 2011.  In 2013, it brought three suits: one in Korea in the Seoul Central Court against CKI, one antitrust action in the Southern District of New York against Citigroup Inc., Citibank N.A. and Citibank Korea, Inc., and the instant action.

Before this Court is defendants' motion to dismiss on the grounds of res judicata and collateral estoppel, statute of limitations, and failure to state a claim. For the reasons set for the below, that motion is GRANTED.

I.      BACKGROUND

        A.      Factual Background[1]

                1.      Decision to Enter Agreement

Simmtech Co., Ltd. ("Simmtech" or "plaintiff") is a Korean exporting company.  (SAC ¶ 75, 360.)  Simmtech receives payment for goods it sells in U.S. dollars (USD) and must then convert them to Korean won (KRW).  (SAC ¶¶ 191-194; 361.)  Embedded in its transactions are costs and the risk of loss due to fluctuations in the USD-KRW exchange rate.  (Id.)

Simmtech had previously used currency forwards as a risk hedging strategy. (SAC ¶¶ 194, 374.)  Under the forward contracts, Simmtech agreed to sell at a specific time in the future at a set rate (the "strike price") a set quantity of USD in exchange for a set quantity of KRW.  (Id.)  If the KRW appreciated against the USD,

---

[1]      In connection with this motion to dismiss, the Court accepts as true all material allegations of the complaint and construes all facts pled in favor of plaintiff.  W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008).

Simmtech would be protected against losses from exchanging less-valuable USD. (Id.)  If the KRW depreciated against the USD, Simmtech would lose out on the exchange premium above previously-agreed upon strike price.  (Id.)

In 2004, the KRW began to steadily appreciate in value against the USD. (SAC ¶ 195.)  A variety of new financial products became available to allow exporters to set a higher strike price than the forward contracts would allow.  (Id.)

In January 2006, Simmtech representatives met with a manager in CKI's foreign exchange sales department;  at the meeting, CKI discussed a financial product referred to as a "catapult," designed to limit the impact of KRW/USD volatility.  Over the following the two months, CKI and Simmtech continued their discussions.  (SAC ¶ 3.)  CKI provided forecasts via reports and emails to Simmtech that the KRW would appreciate significantly against the USD in 2006.  (SAC ¶¶ 393-401, 406-410, 665.)  These forecasts continued throughout 2006 and 2007.  (SAC ¶¶ 736-752.)  Simmtech alleges that at least as of 2007, defendants did not actually believe that the KRW would appreciate against the USD for the next three years, but rather believed the opposite.  (SAC ¶¶ 736-742.)

Simmtech alleges that it trusted CKI's forecasts because it was associated with a large bank, Citigroup.  (SAC ¶¶ 9, 131, 135-137, 142-43.)  It knew that CKI was a part of a group of related Citigroup affiliates, and many of the investor relations documents bore the Citigroup logo.  (SAC ¶¶ 135-137, 142-43.)  Simmtech therefore believed that it was communicating with "Citigroup."  (SAC ¶ 307.) Moreover, Simmtech alleges that although its employees had limited command of

3

English, a large percentage of the documents CKI sent to Simmtech were in English.  (SAC ¶¶ 23, 216, 273, 274, 277-283, 291.)

### 2.    Transaction Structure

In February 2006, Simmtech decided entered into a series of transactions with Citibank Korea Inc. ("CKI"), to purchase a product described to Simmtech as a currency "hedge."  (SAC ¶¶3, 8, 51, 56, 80, 386.)  The product at issue is referred to as a KIKO ("knock-in, knock-out"):  it allowed Simmtech to purchase a set quantity of KRW on a fixed date for a fixed quantity of USD, underlined provided that the KRW was more expensive than a certain strike price.  (SAC ¶¶ 467, 483.)  However, if the KRW became even more expensive, at a certain "knock-out price," Simmtech would lose its ability to exercise its option and to continue earning gains (and CKI, who was on the other end of the transaction, would cap further losses).  (SAC ¶¶ 233, 485-86.)  Simmtech's core allegation is that had it known that CKI stood to gain from the KIKO transactions, it would not have relied the aforementioned currency risk forecasts.  (SAC ¶ 675.)

CKI and Simmtech entered into their first transaction on March 24, 2006, as evidenced by the FX Confirmation, a document that listed what options were being traded between the parties.  (SAC ¶ 703.)  In total, the two entities entered into 15 FX Confirmations between March 2006 and April 2008.  (SAC ¶¶ 704-05.)[2]

As a part of the KIKO agreement, Simmtech not only purchased a group of options from CKI, but it also sold another group of options to CKI.  (SAC ¶ 218.)

---

[2]    The Confirmations all bore the "Citigroup" name and logo.  (SAC ¶¶ 708-12.)  Simmtech alleges that the FX Confirmations were drafted in New York.  (SAC ¶ 713.)

Therefore, CKI was also taking a position in the currency market by purchasing options from Simmtech.  (SAC ¶¶ 496-98.)  CKI had an option to exercise a call option in the event the KRW depreciated substantially against the USD, reaching a certain "knock-in" price.  (SAC ¶¶ 496-98.)  CKI's option did not have a "knock-out" price, which meant that its gains were not capped.  (SAC ¶¶ 521-23.)  The transaction was also structured such that the option held by CKI allowed CKI to purchase "twice as many US dollars as the number of US dollars that Simmtech's option allowed Simmtech to sell."  (SAC ¶¶ 243 519.)  Simmtech alleges that this "2:1 discrepancy" constituted significant risk that Simmtech would "encounter . . . catastrophic loss."  (SAC ¶¶ 243-45, 521, 524.)

The KIKO contracts that Simmtech purchased had three-year terms.  (SAC ¶ 536.)  According to Simmtech, it did not understand that the longer term meant greater exposure to currency market risk and was unsuitable for its three-month lag time between order and payment.  (SAC ¶¶ 33-36, 229-31, 234, 538-39.)  A three-year contract versus a shorter-term contract meant that Simmtech had higher probability of experiencing both:  1) a "knock out" event—i.e., the KRW appreciating very significantly against the USD—which would cause Simmtech to lose the benefits of its options, and 2) a "knock in" event—i.e., the KRW depreciating very significantly against the USD—which would cause CKI to gain the ability to exercise its option to buy USD from Simmtech.  (SAC ¶¶ 229-31, 538-39.)  A representative of CKI told a representative of Simmtech that a long term contract

would allow Simmtech to have a higher strike price for its options and convinced Simmtech to choose the three-year contract.  (SAC ¶¶ 546-48.)

Moreover, Simmtech alleges that defendants wanted CKI to sell KIKOs to Simmtech in order to generate profits for the parent company, Citibank N.A.  (SAC ¶ 530-533.)  Simmtech alleges that defendants and CKI knew that export companies like Simmtech would not understand the risks that the KIKO posed.  (Id.)  Simmtech alleges that it was an unsophisticated buyer of financial products and did not know KIKOs were in fact "highly complex, exotic, risky foreign exchange investment vehicles that exposed [it] to virtually unlimited liability."  (Id. ¶ 10.)

Simmtech alleges that it did not know until February 2013 that defendants directly benefitted from the transactions at issue.  (SAC ¶¶ 71, 455-56.)  According to Simmtech, CKI also engaged in "reverse transactions" with Citibank N.A. whereby CKI transferred any profits to Citibank N.A.  (SAC ¶¶ 297, 509.)  The Second Amended Complaint does not specify what precise "mirroring" transactions CKI and Citibank N.A. engaged in, but stated that Citibank N.A. "realized substantial profit" from these transactions.  (SAC ¶¶ 65, 509.)  This allegedly resulted in CKI not profiting from the transactions, but Citibank N.A. gaining "dollar for dollar" what Simmtech lost.  (SAC ¶¶ 18-19, 53, 65.)  Simmtech also alleges that defendants "designed" the KIKO products in New York.  (SAC ¶ 269.)

Simmtech further alleges that the KIKOs were marketed as "zero cost" instruments.  (SAC ¶¶ 20, 207-08, 253.)  CKI told Simmtech that this zero-cost

feature was because Simmtech's "nominal premium" for its options would be offset by CKI's "nominal premium" for its own options, but that, in reality, the premium that Simmtech paid were higher than those that CKI paid. (SAC ¶¶ 254-56.) Simmtech alleges that it was induced to enter into the KIKO agreement based on the understanding that they were on net zero-cost.  (SAC ¶¶ 662-65.)

Finally, Simmtech alleges that it entered into the KIKO transactions on the understanding that it could terminate or restructure the agreements.  (SAC ¶ 668.) Indeed, the February 2006 agreement provided that it would govern all future transactions.  (SAC ¶¶ 467-70, 476.)  It also provided that Simmtech could terminate or amend the individual transactions with CKI's consent.  (SAC ¶ 471.) This was preceded by email communications between CKI and Simmtech in which CKI's representative stated that termination or restructuring could occur once one year out of the three-year contract elapsed—in particular, if the KRW appreciated, the strike price could be lowered, and if the KRW depreciated, the contract could be extended for another three years.  (SAC ¶ 461.)  Simmtech alleges that this constituted a side agreement.  (SAC ¶ 575.)

Each FX Confirmation, however, contained a provision contradicting the termination / modification clause in the February 2006 Agreement.  (SAC ¶¶ 577, 605.)  The FX Confirmations stated the transaction was exclusively governed by the terms contained within itself and an ISDA (International Swaps and Derivatives Association, Inc.) agreement.  (SAC ¶¶ 580-587.)  Simmtech alleges that it did not

know that the FX Confirmations had this effect because they were in English.  (SAC ¶¶ 588.)

### 3.   Alleged Currency Price Fixing

Simmtech also alleges that—independently of selling KIKOs—defendants also manipulated currency exchange rates during the relevant time period.  (SAC ¶¶ 900-01.)  According to Simmtech, defendants manipulated the WM/ Reuters benchmark rate, which is used by foreign exchange traders all around the world to price currency swaps such as the KIKO.  (SAC ¶¶ 896, 905-06.)  The manipulation affected the price of the KRW and was, of course, not disclosed to Simmtech.  (SAC 901-02.)  Simmtech alleges that if it had known that defendants were manipulating exchange rates, it would not have entered into the KIKO transaction.  (SAC ¶¶ 904, 909.)  However, the Second Amended Complaint does not state how the alleged manipulation affected the KRW valuation.  In other words, it does not state whether the manipulation led to a higher or lower valuation of the KRW against the USD.

### 4.   Plaintiff's Alleged Losses

By December 2008, Simmtech began to experience substantial losses on the KIKOs.  (SAC ¶¶ 454, 819.)[3]  Over the next 3 years, the KRW depreciated significantly against the dollar, and Simmtech's losses continued.  (SAC ¶ 818.)

In December 2008, Simmtech entered into discussions with CKI to restructure the KIKO agreements.  (SAC ¶ 820.)  During these discussions (which

---

[3]   Simmtech alleges that at this point, it had reason to believe that CKI had not been acting as an advisor but rather had interests contrary to that of Simmtech.  (SAC ¶ 454.)

allegedly occurred sixteen times between December 2008 and early 2009), CKI told Simmtech that it had to obtain authorization from the New York defendants.  (SAC ¶¶ 821-22.)  In early 2009, CKI informed Simmtech that restructuring was not possible.  (SAC ¶¶ 823-24, 827.)  Instead, CKI—allegedly working under defendants' instruction—told Simmtech that it could provide a loan for Simmtech to cover its losses.  (SAC ¶¶ 828-29.)  On March 25, 2009, Simmtech received a loan from CKI in the amount of KRW 42 billion, with an interest of approximately KRW 7 billion. (SAC ¶¶ 830-32.)

By March 2011, Simmtech had sustained over $73 million dollars in losses on the KIKOs.  (SAC ¶¶ 834-35.)  It had paid off the entirety of the losses as well as its loan.  (SAC ¶¶ 835.)

> 5.    Other Litigation

Simmtech has already sued CKI for misconduct in Korea regarding similar events.  It filed suit against CKI on December 28, 2012 (the "Korean action").  (SAC ¶ 348.)  On October 2, 2014, the Seoul Central District Court issued a written order entering judgment in favor of CKI on all of Simmtech's claims.  After considering the parties' submissions, making factual findings, and reviewing the relevant law, the Korean trial court determined that the relief sought against CKI was "unfounded."  (Kaplan Decl. Ex. 3, at 36.)[4]  The court's decision was then affirmed on July 20, 2015 by the Seoul High Court.  (Kaplan Decl., Ex. 6, at 7.)

---

[4]    The Court takes judicial notice of the Korean judgment and its translation into English. Negrin v. Kalina, No. 09 CIV 6234, 2010 WL 2816809, at *2 (S.D.N.Y. July 15, 2010). The SAC also expressly references the Korean Action; it is therefore incorporated by reference into the SAC. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

Simmtech also initiated litigation against defendants and other banks in a separate action in the Southern District of New York on November 7, 2013 (the "SDNY FX Action").  See Compl., Simmtech Co., Ltd. V. Barclays Bank PLC et al., No. 13 Civ. 7953 (LGS)  (S.D.N.Y. Nov. 7, 2013).  The suit was brought as a class action.  Simmtech alleged that defendants' manipulation of the WM/ Reuters currency benchmark rates violated Section 1 of the Sherman Act and provisions of the New York General Business Law—in particular, the Donnelly Act, an antitrust statute, and the deceptive practices law.  Simmtech alleges that defendants' actions deprived Simmtech and the class of the benefits of free, open, and unrestricted competition in the currency trading market and that it suffered injury to business or property as a result.  Id. at ¶¶ 70-90.

On January 28, 2015, Simmtech's claims were dismissed.  The court ruled that Simmtech's Sherman Act claims must be dismissed because the allegations implicated "exclusively foreign activity that does not sufficiently affect American commerce," and therefore is barred under the Foreign Trade Antitrust Improvements Act ("FTAIA").  In re Foreign Exch. Benchmark Rates Antitrust Litig., 74 F. Supp. 3d 581, 599 (S.D.N.Y. 2015), appeal withdrawn (Apr. 27, 2015). It also dismissed the claims pursuant to the Donnelly Act on the same grounds. Finally, the Court dismissed the claims brought under the New York deceptive practices law because the alleged deception of the customer did not occur in New York, a requirement under the statute.  Id., 74 F. Supp. 3d. at 601.

B.    Procedural Background

This action was originally filed in state court on July 22, 2013.  It was removed to this Court on September 25, 2013.  (ECF No. 1.)  Plaintiff filed an amended complaint on December 10, 2013 (ECF No. 23) and a Second Amended Complaint ("SAC") on November 21, 2014 (ECF No. 73).

The defendants in this action are CKI's corporate affiliates in the United States.  In essence, the claims in the SAC are based on the theory that, in selling KIKOs to Simmtech, CKI acted as defendants' agent.  In the SAC, Simmtech brings ten claims related to the KIKO transactions themselves, consisting of fraud in the inducement, fraud, negligence, breach of fiduciary duty, tortious interference, unjust enrichment, and rescission/ disgorgement.  Simmtech also brings four fraud-related claims related to the alleged FX manipulation.

Defendants filed the first Motion to Dismiss the SAC in December 2014 on the basis of forum non conveniens, res judicata and collateral estoppel, statute of limitations, and claim-related legal deficiencies.  (ECF Nos. 74, 75.)  This Court granted the Motion on solely forum non conveniens grounds on February 10, 2015. (ECF No. 79.)  The Second Circuit reversed on February 23, 2016, (ECF No. 82-83), and defendants filed a renewed motion to dismiss on May 13, 2016.  (ECF Nos. 95, 96.)

II.    LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must provide grounds upon which his claim rests through "factual allegations sufficient 'to raise a right to

relief above the speculative level.'" <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (2d Cir. 2010) (quoting <u>Twombly</u>, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." <u>Id.</u>  The Court will give "no effect to legal conclusions couched as factual allegations." <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555).  A plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession and control of the defendant." <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010).  But, if the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate. <u>Twombly</u>, 550 U.S. at 570; <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>, 556 U.S. at 679).

A court may properly consider documents and contracts attached to or incorporated by reference in a complaint on a Rule 12(b)(6) motion to dismiss. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  In resolving a challenge to standing under Rule 12(b)(1), courts may look outside the pleadings to "resolve factual disputes concerning the existence of jurisdiction."  United States v. Vazquez, 145 F.3d 74, 80 (2d Cir. 1998); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986).

III.    DISCUSSION[5]

A.    Claims 11-14 and Res Judicata (The SDNY FX Action)

Defendants move to dismiss the four fraud claims in Claims 11 through 14[6] in the SAC on the basis that they are barred by the doctrine of res judicata in light of the dismissal of the SDNY FX Action.  This Court agrees.

"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  Allen v. McCurry, 449 U.S. 90, 94 (1980).  Res judicata, or "claim preclusion," and the doctrine of collateral estoppel, or "issue preclusion," "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources,

---

[5]    The Court notes that no new arguments were brought in the second Motion to Dismiss that relate to this Court's Opinion here.  In any event a motion to dismiss under Rule 12(c) would have also been proper.  Plaintiff has also had the opportunity to be heard on all arguments.

[6]    In addition to alleging fraud in relation to currency manipulation, Claims 11 through 14 also allege fraud in relation to the reverse transaction between Citibank N.A. and CKI. The latter is not addressed in the SDNY FX Action and therefore not precluded on that basis. The Court discusses those portions of Claims 11 through 14 elsewhere in this Opinion.

and, by preventing inconsistent decisions, encourage reliance on adjudication." Id. To assert the defense of res judicata, a defendant must prove "that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Monahan v. New York City Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000).

Plaintiff makes three arguments against res judicata.[7]  First, it asserts that the dismissal of the SDNY FX Action was not on the merits.  Second, it argues that the facts in the two cases are dissimilar.  Third, it contends that because the SDNY FX Action was pled as a class action, it could have raise common law fraud claims that are raised in this case because the elements of fraud were not common among all class members.  None of these arguments are persuasive.

First, the claims in the SDNY FX Action were adjudicated on their merits. Plaintiff's argument that dismissal based on the FTAIA is jurisdictional rather than a judgment on the merits is belied by Second Circuit caselaw.  In Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 405 (2d Cir. 2014), the court held that "we have little difficulty concluding that the requirements of the FTAIA go to the merits of an antitrust claim rather than to subject matter jurisdiction. Nothing in the statute 'speak[s] in jurisdictional terms or refer[s] in any way to the jurisdiction of

---

[7]      Plaintiff also notes that the SDNY FX Action was filed later than the instant action.  This is of no consequence.  The preclusive effect of res judicata stems from an earlier judgment, not from an earlier-filed suit.  See Gonzalez v. City of New York, 396 F. Supp. 2d 411, 415 n.3 (S.D.N.Y. 2005) ("[F]or the purposes of res judicata, the effective date of a final judgment is the date of its rendition, without regard to the date of commencement of the action in which it is rendered or the action in which it is to be given effect." (quoting Restatement (Second) of Judgments § 14 & cmt.a (1982)).

the district courts.'" (quoting <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 515 (2006).  The fact that the Court in the SDNY FX Action did not actually evaluate the merits of whether defendants engaged in the alleged practices is of no import.  "It is a misconception of res judicata to assume that the doctrine does not come into operation if a court has not passed on the 'merits' in the sense of the ultimate substantive issues of a litigation."  <u>Angel v. Bullington</u>, 330 U.S. 183, 190 (1947); <u>see also</u> <u>Federated Dep't Stores, Inc. v. Moite</u>, 452 U.S. 394, 399 n.3 (1981) ("[A] dismissal for failure to state a claim . . . is a judgment on the merits." (internal quotation marks and citations omitted)).

Next, although the fraud claims here were not litigated in the SDNY FX Action, the claims in both actions involved the "same transaction or connected series of transactions at issue," and "the same evidence is needed to support" them.  <u>Pike</u> <u>v. Freeman</u>, 266 F.3d 78, 91 (2d Cir. 2001).  Plaintiff argues that the facts of the claims in this case and the facts of the SDNY FX Action were different because the SDNY FX Action focused on the facts relating to coordination between defendants and other banks to manipulate the market, whereas the facts of this case relate to the material omission—namely, that defendant was engaged in market manipulation—which, if made known to plaintiff, would have prevented it from entering into the KIKO transaction.  The Court disagrees.  As long as the later claim arose "out of the same factual grouping as an earlier litigated claim," it is barred even if it "is based on different legal theories or seeks dissimilar or additional relief."  <u>LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester</u>, 40 F.3d

587, 591 (2d Cir. 1994) (alternations omitted); see also Teltronics, 762 F.2d at 193

("New legal theories do not amount to new causes of action so as to defeat the

application of the principle of res judicata.)

　　In this case, the claims relating to defendants' alleged exchange rate

manipulation are based on the same "factual groupings" as the allegations in the

SDNY FX Action. The common nucleus of fact is the alleged currency manipulation.

From it, Simmtech has asserted varying legal theories:  that it impeded Simmtech's

participation in a competitive free market in violation of the Sherman Act, that it

constituted deceptive business practices under the New York general business law,

and that it constituted common-law fraud.  The alleged manipulation is essential to

all of these claims, and all the claims arise from the same "nucleus" of conduct that

plaintiff complains of.  Cameron v. Church, F. Supp. 2d 611, 620 (S.D.N.Y. 2003)

(internal citation omitted). "[T]he facts essential to the barred second suit need not

be the same as the facts that were necessary to the first suit. It is instead enough

that the facts essential to the second were [already] present in the first." Waldman

v. Vill. of Kiryas Joel, 207 F.3d 105, 110–11 (2d Cir. 2000) (internal citations

omitted).

　　Although plaintiff asserts additional facts in the instant case relating to its

reliance on the material omission (that defendants were manipulating currency

rates), the decision not to plead the additional facts in support of fraud claims in the

SDNY FX Action does not absolve plaintiff from res judicata.  A plaintiff cannot

avoid res judicata by "splitting his claim into various suits, based on different legal

theories (with different evidence 'necessary' to each suit." Cameron v. Church, F.

Supp. 2d 611, 620 (S.D.N.Y. 2003) (citing Waldman v. Village of Kiryas Joel, 207

F.3d 105, 110 (2d Cir. 2000)).

Finally, Simmtech cannot use the class action form as a tool to circumvent

the doctrine of res judicata.  Simmtech argues that res judicata does not apply

because it could not have asserted the common law fraud claims—which involve

proving reliance—in the SDNY FX Action, which was brought as a class action.

Simmtech cites to the class action exception to claim splitting.  However, that

exception protects absent class members who had no choice in determining what

claims the class action encompasses (and especially for an opt-out class) from being

barred from asserting their individualized grievances which were not included in

the class action.  See Makor Issues & Rights, Ltd. v. Tellabs, Inc., 256 F.R.D. 586,

597 (N.D. Ill. 2009) ("As Moore's [Federal Practice] explains, the special nature of

class actions—representation in absentia and often without notice—requires this

exception.").  As the Seventh Circuit has explained, the exception to claim splitting

applies where, "before a class member may be barred from pursuing an individual

claim for damages, he must have been notified that he was required to adjudicate

his damage claims as part of a prior class action suit." Crowder v. Lash, 687 F.2d

996, 1008 (7th Cir. 1982) (emphasis added).  Moreover, the exception appears to

apply only to class actions seeking only declaratory or injunctive relief.  See In re

Vitamin C. Antitrust Litig., 279 F.R.D. 90, 114-15 (E.D.N.Y. 2012) (collecting cases).

The SDNY FX Action sought not only declaratory relief but also money damages.

17

It makes little sense to apply the exception here because the concerns of representation in abstentia and lack of notice do not exist for Simmtech.  See Collins v. E.I. DuPont de Nemours & Co., 34 F.3d 172, 175 (3d Cir. 1994) (holding that earlier class action has preclusive effect on all plaintiffs in new action who were named plaintiffs in earlier suit except one, who was only a putative class member).  Simmtech was the lead plaintiff of a putative class;  it was the one who decided to bring the SDNY FX Action as a class action.  It chose what claims to pursue in that action.  It does not face the dilemma that class members would face in choosing on the one hand whether to opt-out of a class suit and the declaratory or injunctive relief that it may provide and on the other hand whether to stay in the class but be barred from a later suit seeking damages.  See Vitamin C Litig., 279 FRD at 115, n.6.  Moreover, the class action exception to claim splitting does not provide a loophole for lead plaintiffs to use the class action mechanism as a means of evading the rule against claim splitting, as plaintiff is attempting here.

The bottom line is that plaintiff cannot slice and dice its theories into separate lawsuits.  The doctrine of res judicata applies "not only as to what was pleaded, but also as to what could have been pleaded."  In re Teltronics Servs. Inc., 762 F.2d 195, 193 (2d Cir. 1985).  The claims in this action could have been pleaded in the SDNY FX Action.  Plaintiff chose not to do so, and cannot have a second bite at the apple.

B.    Claims 1-10 (The Korean Action)

The October 2, 2014 judgment of the Seoul Central District Court—later affirmed by the Seoul High court—also bars Simmtech from relief on its remaining claims in this action.  Before turning to the specific doctrines of res judicata and collateral estoppel as they apply in this action, this Court addresses several threshold issues.

First, the judgment of the Seoul High court should be recognized as a matter of comity.  See Victrix S.S. Co. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 (2d Cir. 1987) ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy").  Plaintiff does not challenge this proposition.

Second, this Court applies federal res judicata and collateral estoppel rules to the remaining claims.  Plaintiff appears to argue that the preclusive rules of Korea apply.  (See Pl.'s Mem. of L. at 8, n.10).  However, the Court notes that the prevailing practice appears to be "follow[ing] domestic rules of preclusion, whether they apply those of the applicable federal or state court."  Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 32 (D.D.C. 2007); Alfadda v. Fenn, 966 F. Supp. 1317, 1329 (S.D.N.Y. 1997), aff'd, 159 F.3d 41 (2d Cir. 1998) ("[T]he Court concludes that a federal court should normally apply either federal or state law, depending on the nature of the claim, to determine the preclusive effect of a foreign country judgment"); Restatement (Third) of Foreign Relations Law § 481 (1987)

19

(stating that although "a judgment of a foreign country ordinarily has no greater effect in the United States than in the country where the judgment was rendered . . . no rule prevents a court in the United States from giving greater preclusive effect to a judgment of a foreign state than would be given in the courts of that state."). The Court agrees with the court in <u>Alfadda</u> that "[r]egardless of the mechanisms utilized by a foreign court to achieve its objectives [regarding preclusion], a United States court should not be confined to using the foreign court's mechanisms or else forgo achieving its own objectives." <u>Alfadda</u>, 966 F. Supp. at 1329.

Because defendant Citigroup Overseas Investment Corporation's is a federally-chartered Edge Act Corporation and the transaction at issue is of an international nature, there is federal jurisdiction over this case and this Court applies federal res judicata and collateral estoppel rules. <u>See</u> 12 U.S.C. § 623 ("[A]ll suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of . . . international or foreign financial operations . . . shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits."); <u>Am. Int'l Grp., Inc. v. Bank of Am. Corp.</u>, 712 F.3d 775, 784 (2d Cir. 2013) ("[Section] 632 provides that in order for its grant of federal jurisdiction and removability to apply, the suit must have a federally chartered corporation as a party, and the suit must arise out of an offshore banking or financial transaction of that federally chartered corporation.")

1.    Res Judicata

Plaintiff's claims 1 through 10 all involve the same nucleus of fact adjudicated in the Korean Action and is therefore barred by the doctrine of res judicata.  As discussed above, the three elements of a res judicata defense are that 1) the previous action involved adjudication on the merits, 2) the previous action involved the same parties or those in privity with them, and 3) the claims asserted in the later action were or could have been raised in the prior action.  See Monahan, 214 F.3d at 285; Saud v. Bank of New York, 929 F.2d 916, 919 (2d Cir. 1991).

Plaintiff does not contest element one or the notion that Claims 1 through 10 in this action rested on the same essential facts arising from the same transaction or series of transactions as the Korean action.  See Teltronics, 762 F.2d at 193.  Instead, plaintiff's main argument against res judicata is that it was unaware that it should sue defendants, and instead sued CKI.  There are two reasons why this argument is unavailing.

First, the face of plaintiff's SAC contains a litany of allegations regarding its knowledge as of 2006 to 2008 that Citigroup—the American corporation—was the entity with which Simmtech was doing business.  For example, a significant portion of the allegations are with regards to the fact that marketing materials and other documents provided to Simmtech in advance of their decision to enter into the KIKO transactions bore the Citigroup—not CKI—name and logo and were written entirely in English.  (See SAC ¶¶ 23, 216, 273, 274, 277-283, 291.)  Indeed, the SAC states that "at all relevant times, many if not all of CKIs advertising and marketing

materials prominently bore the label 'Citigroup' . . . In advertisements and other marketing materials, CKI advertised itself as 'Citigroup,' 'Citibank,' or merely 'Citi,' and freely used Citi logos such as the Citigroup umbrella." (SAC ¶ 131.)  Simmtech also alleges that the branding of documents and other factors compelled Simmtech to believe that the individuals it met with in initial discussions about the KIKO January and February 2006 worked for Citigroup and that there was no distinction between CKI and Citigroup. (SAC ¶¶ 383-401.)  Therefore, as of the very commencement of the relationship between Simmtech and CKI, Simmtech had reason to know of the involvement of Citigroup's American affiliates. In fact, Simmtech alleges that its reliance on CKI's advice as of January or February 2006 was based on its status as a part of Citigroup. (See SAC ¶¶ 9, 131, 135-137, 142-43, 383-401.)  Because Simmtech believed that it was doing business with Citigroup since the beginning of the transaction at issue, (see SAC ¶ 307), it is difficult to fathom how plaintiff did not know it should sue Citigroup when it initiated the Korean Action in December 2012.[8]

Second, the question of whether a plaintiff was aware of the identity of defendants in the later action is not a relevant one for the purposes of res judicata. With respect to the identity of parties, all that res judicata requires is that the parties are in privity with each other. Monahan, 214 F.3d at 285.  To the extent that plaintiff suggests CKI was not in privity with defendants, that position is

---

[8]      Even if the fact of Citigroup's involvement was somehow truly newly discovered, this does not preclude the application of res judicata because there is no allegation that Citigroup's role was somehow "fraudulently concealed" or "could not have been discovered with due diligence." Saud v. Bank of New York, 929 F.2d 916, 920 (2d Cir. 1991).

untenable.  Plaintiff repeatedly asserts in the SAC the close relationship between CKI and defendants, and its claims in this case depend on the core, repeated assertion that CKI was an agent of defendants.  (SAC ¶¶ 511, 579, 775-76, 781.) Plaintiff also stated in the SAC that as of 2010, CKI was wholly owned by Citigroup Korea, Inc., which in turn had "more than" 99.9% of its ownership held by defendant Citigroup Overseas Investment Corp.  (SAC ¶ 82.)  Moreover, plaintiff acknowledges that "at all relevant times, Defendants owned and controlled CKI as an agent."  (SAC ¶ 83.)  Thus, according to the very facts alleged by plaintiff, defendants were in privity with CKI.  See Farber v. Goldman Sachs Grp., Inc., 10 Civ. 873 (BSJ), 2011 WL 666396 (S.D.N.Y. Feb. 16, 2011) (holding that a parent company of a wholly-owned subsidiary was in privity with its subsidiary for the purposes of res judicata); see also Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343, 346 (2d Cir. 1995) ("For purposes of claim preclusion, the requisite privity must be found in the substantial identity of the incentives of the earlier party with those of the party against whom res judicata is asserted.").

Similarly, there is no requirement under res judicata that the court rendering the earlier judgment must have had jurisdiction over the party asserting res judicata in the later action.[9]  Plaintiff's argument on this basis is incorrect and

---

[9]     Indeed, one can imagine that a prior judgment issued by a federal court with diversity jurisdiction over plaintiff and defendant 1 would have preclusive effect over a later suit in state court in State A involving the same plaintiff and defendant 2 (who is in privity with defendant 1), both of whom are citizens State A.  In that scenario, the federal court issuing the prior judgment would not have jurisdiction over defendant 2 because of lack of diversity; nevertheless, there is no exception to res judicata under this scenario.

without basis.[10]  Claims 1 through 10 are therefore barred by the doctrine of res judicata, as they have already been resolved against plaintiffs in the Korean Action.

### 2.     Collateral Estoppel

In addition to res judicata, or "claim preclusion," the doctrine of collateral estoppel, or issue preclusion, also prohibits plaintiff from asserting Claims 1 to 7, Claims 9 to 10, and the non-FX manipulation claims in Claim 11-14.  "Four elements must be met for collateral estoppel to apply: (1) the issues of both proceedings must be identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there must have been 'full and fair opportunity' for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits."  Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A., 56 F.3d 359, 368 (2d Cir. 1995).  Plaintiff has failed to meaningfully oppose defendants' collateral estoppel arguments.  The Court has reviewed the Korean judgment and the claims asserted in this action, and find that each of Claims 1 through 10, except Claim 8, contain issues that were decided against plaintiff in the Korean Action.  In particular, the Korean judgment rejected the notion that CKI made any material omissions upon which plaintiff relied, and found that CKI had "provided sufficient explanation to a degree that could be understood by [Simmtech] including the structure and details

---

[10]      Plaintiff's citation to A.P. Moller-Maersk A/s v. Ocean Express Miami is wholly inapposite and, in fact, misleading.  The Ocean Express court's discussion of jurisdiction pertained to the United States' decision to recognize a foreign decision, which was characterized as "permissive, unlike the mandatory doctrines of res judicata, collateral estoppel and full faith and credit."  550 F. Supp. 2d 454, 470 (S.D.N.Y. 2008) (emphasis added).

of the FX option Contracts in this case, concrete information on profits that can be reaped and the risk that may be triggered by exchange rate fluctuation or concrete details on loss that can be sustained from the respective FX Option Contracts in this case." (Kaplan Decl. Ex. 3, at 32-33.)  It also found that "it cannot be seen that [Simmtech's] having entered into the above respective FX option contracts caused excessive risk to be generated." (Id. at 22.)  The Court also found that the decision to enter into the longer, three-year contract term was based "a management decision on the part of [Simmtech]." (Id. at 30.)  Finally, the court found that "with exchange rates being the most difficult economic indicators to forecast, to perceive that [CKI] was behooved to suggest concrete exchange rate fluctuation forecasts would be overkill."  Rather, Simmtech "appears to have had knowledge that prospects of the market taking a turn largely contrary to expert forecasts was high." (Id. at 34-35.)  The Korean court's findings on these issues preclude the successful assertion of each claim under claims 1 – 7, 9, and 10.

As for Claim 8, this Court has not identified any issues relating to tortious interference in the Korean judgment.  In fact, there appears to be no discussion of the alleged interference with the February 2006 contract terms regarding termination and restructuring.  This claim is therefore not precluded by collateral estoppel.

3.      Statute of Limitations

Claims 1 through 10 are also barred by the statute of limitations.  A foreign plaintiff's claims must be timely under both New York law and the law of the

jurisdiction where the action accrued.  N.Y. C.P.L.R. § 202.[11]  As to plaintiff's tort claims, because the injury alleged in this complaint is purely economic, the causes of action accrued "where plaintiff resides and sustains the economic impact of the loss";  in this case, the causes of action accrued in Korea.  Global Fin. Corp. v. Triar Corp., 93 N.Y.2d 525, 529 (1999).

a)      Korean Statutes of Limitations

Claims 1 through 10 are barred by the Korean statute of limitations and therefore must be dismissed. Under Korean law, the statute of limitations for tort damages are the earlier of three years from when plaintiff became aware of his or her damages and the identity of the tortfeasor, and ten years from the occurrence of the tortious act.  (Lee Decl., ECF No. 48, ¶ 10.)  See also Woori Bank v. Citigroup Glob. Markets, Inc., 609 F. App'x 696, 697 (2d Cir. 2015) ("The right to claim for damages resulting from an unlawful act shall lapse by prescription if not exercised within three years commencing from the date on which the injured party or his agent by law becomes aware of such damage and of the identity of the person who caused it.")

Plaintiff has acknowledged that it knew of mounting economic damages as early as December 2008.  (SAC ¶ 454.)  In addition, plaintiff alleges that it believed the advice regarding the currency market and the suitability of the KIKO transaction came from Citigroup;  in fact, plaintiff alleges that it believed it was

---

[11]     For Edge Act cases, the court follows the substantive laws of the state in which it sits—in this caase, New York.  Loreley Financing (Jersey) No. 3 Ltd. V. Wells Fargo Securities LLC., 797 F.3d 160, 169-70 (2d Cir. 2015).

doing business with Citigroup.  (See SAC ¶¶ 23, 216, 273, 274, 277-283, 291, 307.)

Moreover, as to the tortious interference with contract claim, the SAC alleges that

in early 2009, CKI told Simmtech that Citigroup would not give permission for

restructuring based on the 2006 agreement.  (SAC ¶¶ 821-22, 823-24, 827.)  There is

no question, therefore, that based on the face of the SAC, plaintiff knew of the

identity of the tortfeasor as early as 2006 but not later than early 2009.  Plaintiff's

argument that it did not know "the twisted intermingling of affiliates" does not save

its argument, since it acknowledged in its SAC that it received investor relations

documents bearing contact information for Citigroup defendants.  (SAC ¶ 137.)[12]

This is not a situation where plaintiff would have been relying on "only

presumptions and guesses," but rather on the basis of its personal knowledge and

documents bearing defendants' logo and name that were in plaintiff's possession.

Woori Bank, 609 F. App'x at 700.  Plaintiffs thus had three years from either 2006

or 2009 to bring suit on the tort claims.  Because plaintiff did not bring this action

until 2013, which at least four to seven years after the actions accrued, the claims

are untimely and must be dismissed.

 As to plaintiff's contract claim for unjust enrichment and recission, Korean

law requires that for such claims, the allegedly defrauded party must first seek

recission of the contract within three years of plaintiff's becoming aware of the

---

[12] The Court notes that the allegations regarding Citibank N.A. entering into "reverse transactions" with CKI do not affect the fact that plaintiff knew of its damages and of defendants' identities in 2006-2009.  By virtue of being on the other side of the KIKO transaction as CKI, plaintiff must have known that CKI and its affiliates had the opposite gain / loss profile as plaintiff. That plaintiff did not know CKI transferred its position to a Citigroup affiliate does not affect the time that the actions in this case accrued.

grounds for recission.  (Lee Decl. ¶ 14.)  Plaintiff does not dispute that it became aware of fraudulent conduct not later than December 2008.  Therefore, the last to file date for this claim was December 2011.  Plaintiff did not seek recission until 2013.  Therefore, the unjust enrichment and recission claims are untimely.

> b)    New York Statutes of Limitations

Because plaintiff's claims 1-10 are time-barred under Korean law, they are also time-barred under New York law pursuant to CLPR § 202.  Moreover, New York's statutes of limitations on also bar plaintiff's tortious interference claim and negligence claim.[13]

A tortious interference claim has a three-year limitations period in New York and accrues no later than the date on which plaintiff allegedly sustains an injury, not the date of discovery.  N.Y. C.P.L.R. § 214(4); S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery, Inc., No. 10 Civ. 7547 KMW, 2013 WL 1234937, at *7 (S.D.N.Y. Mar. 26, 2013).  Plaintiff's only argument against the time bar is that it continued to suffer losses as a result of the alleged tortious interference from December 2008 until March 2011.  But the fact that the effects of the alleged wrongdoing continued until 2011 does not give plaintiff license to sit on its rights.  The action accrued "when the claim becomes enforceable," which in this case occurred in 2008.  Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993).  Moreover, tortious interference is not a "continuing tort" and does not allow plaintiff to extend

---

[13]    As to the breach of fiduciary duty claims, plaintiff alleges that they are borne of fraud and are thus subject to a six-year statute of limitations. The Court need not address that issue here, as the claims are dismissed for other reasons stated in this opinion.

the statute of limitations on that basis. <u>Bloomfield Bldg. Wreckers, Inc. v. City of Troy</u>, 41 N.Y.2d 1102 (1977).

Negligence claims under New York law are also subject to a three-year statute of limitations. N.Y.C.P.L.R § 214(4)-(5). Plaintiff has pled this claim as a negligence claim, separate from its fraud claims. Therefore, it is subject to the three-year limitations period and not the six-year period for fraud. If plaintiff is alleging fraud in this claim, it is duplicative of plaintiffs other fraud claims and should be dismissed on that basis. <u>See</u> <u>AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.</u>, 11 N.Y.3d 146, 154-55 (2008).

Plaintiff has not sufficiently demonstrated that the statute of limitations for these claims are tolled for equitable estoppel. "Equitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the defendant." <u>Putter v. N. Shore Univ. Hosp.</u>, 7 N.Y.3d 548, 552-53 (2006). Here, there is no allegation that defendants "somehow kept [plaintiff] from timely bringing suit." <u>Id.</u> In fact, plaintiff has alleged that it knew that defendants were the ones who refused to allow restructuring under the February 2006 contract. (SAC ¶ 824.) It also alleged that it knew that it was doing business with Citigroup from the beginning and that it began to sustain losses on the KIKOs in 2008. There is therefore no basis for application of equitable estoppel here:  not only did defendants did not keep plaintiff from timely bringing suit, but plaintiffs also had no reason to not bring these actions within the three-year

limitations period. Therefore, plaintiff's claims for negligence and tortious interference, which were brought five years later in 2013, are untimely.

    C.   <u>Merits of Individual Claims</u>

The Court now turns to plaintiff's individual claims and finds that the vast majority of them fail to state a claim and must be dismissed.

    1.   <u>Fraud Claims</u>

The bulk of plaintiffs causes of action sound in fraud. "The elements of fraud are a misrepresentation or a material omission of fact which was known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or omission, and injury." <u>VisionChina Media Inc. v. Shareholder Representative Servs., LLC</u>, 967 N.Y.S.2d 338, 343 (App. Div. 2013).[14] The Court addresses the "original" fraud claims (claims 1 through 3) and the "new" fraud claims relating to the FX rate manipulation (claims 11-14) separately. These claims are facially deficient based on the allegations in the SAC.

    a)   "Original" Fraud Claims (Claims 1-3)

The original fraud claims fail because plaintiff has failed to plead misrepresentation and justifiable reliance. First, the SAC fails to specify any

---

[14]    Plaintiff also pleads conspiracy to commit fraud and aiding and abetting fraud. "To plead a valid cause of action for conspiracy under New York law, a plaintiff must allege the primary tort" and additional elements regarding the conspiracy. <u>De Sole v. Knoedler Gallery, LLC</u>, 974 F. Supp. 2d 274, 315 (S.D.N.Y. 2013). The primary elements of the fraud claim must also be alleged for an aiding and abetting claim. <u>Weshnak v. Bank of Am., N.A.</u>, 451 F. App'x 61, 61–62 (2d Cir. 2012) ("Under New York law, the elements of aiding and abetting a breach of fiduciary duty, aiding and abetting a conversion, and aiding and abetting a fraud are substantially similar. The claims require the existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance.")

particular statements as fraudulent misrepresentations.  Second, in its briefing,[15]
the three statements identified fail to meet the elements of fraud:  1) that the
KIKOs were "zero cost," 2) that they were "hedges," and 3) that the USD would
depreciate relative to the KRW.

First, the statement that the KIKOs were "hedges" is not a cognizable
misrepresentation.  There is no question that at certain KRW/USD exchange rate
levels, the KIKOs could provide a hedge.  Plaintiff does not allege that defendants
represented that KIKOs would be a hedge at all exchange rates;  indeed, such an
allegation would directly contradict the very premise of the KIKO.  Furthermore, at
no time did plaintiff allege that it did not understand the concept of a knock-out
price or a knock-in price.  Rather, it claimed that it did not understand that the
relative consequences of the transaction for itself versus for CKI.  That KIKOs may
have been too aggressive a product or otherwise unsuitable for plaintiff s particular
position does not mean that the "hedge" descriptor is a misrepresentation.

Moreover, any statements by CKI or defendants that the USD would
depreciate relative to the KRW cannot be the basis for a fraud claim.  "Mere
predictions . . . may not form the basis for an action for fraud when both parties
have equal access to the facts, or when it is obvious that the declarant is using a
subjective standard. In these situations, reliance on the opinions is deemed
unreasonable." Kimmell v. Schaefer, 637 N.Y.S.2d 147, 149 (App. Div.), aff'd, 89

---

[15]    It is long settled that a party may not—by way of a brief—amend a pleading.  See, e.g., Pollio
v. MF Global, Ltd., 608 F. Supp. 2d 564, 568 (S.D.N.Y. 2009); Fadem v. Ford Motor Co., 352
F.Supp.2d 501, 516 (S.D.N.Y.2005).

N.Y.2d 257 (1996) (internal citations and alterations omitted).  As an exporter, plaintiff knew that exchange rates are volatile.  (SAC ¶¶ 193-94.)  That is the precise reason why plaintiff sought these currency hedging instruments in the first place.  Indeed, it is plainly not plausible that plaintiff actually believed that defendants accurately predicted the future direction of the exchange rate; if this were so, plaintiff would not have entered into the KIKO—it would have taken a straight bet in the exchange rate.  Moreover, plaintiff knew that despite whatever forecasts defendants made regarding the exchange rate, CKI was taking the opposite side of plaintiff's position in every option in the KIKO transaction. Therefore, plaintiff cannot possibly assert that it justifiably relied on the representation as to what direction the exchange rate would go.

Plaintiff also cannot plead justifiable reliance on the "zero cost" representation.  Essentially, plaintiff is alleging that it justifiably relied on defendants' promise that the KIKOs were free. This is patently unreasonable, as plaintiff, which had previously purchased currency forwards at cost—could not have justifiably believed that defendants' offering would miraculously be free. Furthermore, because the FX confirmations listed the premiums for each option, plaintiff could have easily deduced that the transaction was not actually cost-free. There is no justifiable reliance "where a plaintiff does not bother to consult a source of information that might have revealed the alleged fraud."  ACA Fin. Guar. Corp. v. Goldman, Sachs & Co., 25 N.Y.3d 1043, 1049 (2015).

Finally, the fact that the FX Confirmations contained an express "Non-Reliance" clause cannot not be ignored merely because the Confirmation was in English.  The clause states that each party "has made its own independent decision to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based on its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction."  (Kaplan Decl. Ex. 1, at 12.)  Plaintiff has only asserted that its employees' command of English was limited, but makes no allegation that the Simmtech employees who signed the Confirmations did not understand this specific clause.  In all events, a total "inability to understand the English language, without more, is insufficient to avoid this general rule" that the signer of an agreement is "deemed to be conclusively bound by its terms."  <u>Maines Paper & Food Serv. Inc. v. Adel</u>, 681 N.Y.S.2d 390, 391 (App. Div. 1998); <u>see also</u> <u>Holcomb v. TWR Express, Inc.</u>, 782 N.Y.S.2d 840, 841 (App. Div. 2004).  Moreover, plaintiff's suggestion that Simmtech employees' limitations in the English language should excuse them from being bound by the FX Confirmation is belied by the SAC's allegations that they relied on English language market forecasts.  (SAC ¶¶ 392-402.)  For these reasons, Simmtech has failed to state a claim as to fraud in Claims 1 to 3.

b)      "New" Fraud Claims (Claims 11-14)

Plaintiff's fraud claims based on the alleged exchange rate manipulation and the "reverse" transactions between CKI and Citibank N.A. also fail.

First, there is no basis for reliance or loss causation resulting from any alleged exchange rate manipulation because, according to the CFTC's findings that plaintiff cites in the SAC, the manipulation occurred from 2009 to 2012, after plaintiff purchased the KIKO products. (See CFTC Order, Kaplan Decl. Ex. 8, at 2.)[16]  Although plaintiff alleges that defendants had been manipulating rates since 2004 "based on the CFTC's conclusions," it does not provide any explanation for the discrepancy between the "2004" assertion and the CFTC Order itself. Therefore, plaintiff has failed to plead any possibility that it would not have entered into the KIKO transactions had it known of defendants' alleged conduct in exchange rate manipulation.

Second, plaintiff has failed to allege that the fact that Citibank N.A. was the entity with which CKI made its reverse transactions was a material omission. There is no question that by entering into the KIKO transaction with CKI, Simmtech knew that CKI was taking the opposite bet that Simmtech was taking. Simmtech also alleges if CKI had entered into reverse transactions with a non-Citi entity, that would not have been material to its decision to enter the KIKO transaction. (SAC ¶ 1054.) Nowhere in the SAC has Simmtech explained why the fact of CKI's transferring of its profits to a parent company versus another entity would make any difference to Simmtech. (SAC ¶ 297.) The claim is simply implausible and does not meet the Twombly / Iqbal standard for surviving a motion to dismiss.

---

[16]     The SDNY FX Complaint, strangely enough, does not make any allegations as to when the alleged manipulation took place. (See Kaplan Decl. Ex. 6.)

### 2.    Breach of Fiduciary Duty Claims (Claims 5-7)

Plaintiff's claims for breach of fiduciary duty fail because it has failed to establish that defendants were fiduciaries.[17]  "A fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Roni LLC v. Arfa, 18 N.Y.3d 846, 848 (2011). Plaintiff's entire basis for the allegation that defendants are fiduciaries is that defendants acted through an agency relationship with CKI, which was a fiduciary. But the facts alleged in the complaint make it objectively implausible that CKI had a fiduciary relationship with Simmtech.  To start, as discussed above, it is undisputed that CKI took the opposite side of every trade that Simmtech made in the KIKOs.  This makes it mathematically impossible for CKI and Simmtech could have had common interests and that CKI was "act[ing] for . . . the benefit" of Simmtech.  Roni, 18 N.Y.3d at 848; see also Boccardi Capital Sys., Inc. v. D.E. Shaw Laminar Portfolios, L.L.C., 355 F. App'x 516, 519 (2d Cir. 2009). Similarly, the fact that the alleged term in the 2006 Agreement provided that Simmtech could try to obtain consent from CKI to amend the terms of the options if market conditions changed suggests the opposite of a fiduciary relationship.  (See SAC ¶ 471).

Moreover, plaintiff's theory of fiduciary duty appears to be based solely on the fact that CKI provided financial advice.  (SAC if 1017.)  But mere dispensing of

---

[17]    As discussed above, to sufficiently plead an aiding and abetting or conspiracy claim, plaintiff must sufficiently allege the primary elements of a tort such as breach of fiduciary duty in addition to additional elements of conspiracy and aiding and abetting.  De Sole, 974 F. Supp. 2d at 315; Weshnak, 451 F. App'x at 61–62.

economic forecasts and opinions relating to the markets is insufficient to show that CKI "agreed to act for or give advice for the benefit of CKI."  <u>Boccardi</u>, 355 F. App'x at 519.

Finally, as discussed above, the FX Confirmations contained express disavowals of fiduciary duty.  The statement is short and direct:  "Status of parties. The other party is not acting as a fiduciary for or an advisor to it in respect of the Transaction."  (Kaplan Decl. Ex. 1, at 13.)  Plaintiff's suggestion as to Simmtech employees' less-than-perfect command of English alone does not excuse it from being bound by these terms.  <u>See Maines Paper & Food Serv. Inc. v. Adel</u>, 681 N.Y.S.2d 390, 391 (App. Div. 1998); <u>see also Holcomb v. TWR Express, Inc.</u>, 782 N.Y.S.2d 840, 841 (App. Div. 2004).

### 3.   Unjust Enrichment (Claim 9)

To assert an action for unjust enrichment, plaintiff must show "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." <u>Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.</u>, 373 F.3d 296, 306 (2d Cir. 2004). Plaintiff has not done so here.

Plaintiff's basis for asserting unjust enrichment is that Citibank N.A. was enriched by entering into reverse payment transactions with CKI. However, there is no plausible allegation that the fact of the reverse payment transaction was what enriched Citibank N.A. at plaintiff s expense. As discussed above, any moves in the KRW / USD market at plaintiff s expense would have benefitted CKI. That CKI

transferred any gains to Citibank N.A. is not in itself a basis for "unjustly enriching" Citibank N.A. Plaintiff has in essence failed to allege why the profit-sweeping setup between CKI and Citibank N.A. is of any consequence.  Indeed, plaintiff has acknowledged that if CKI had entered into reverse transactions with a non-Citi entity, that would not have been material to its decision to enter the KIKO transaction.  (SAC ¶ 1054.)

4.  Rescission (Claim 10)

Plaintiff alleges that the KIKOs are unenforceable because:  1) the contracts are "unconscionable," 2) plaintiffs should be protected by the doctrine of unilateral mistake, and 3) that defendants breached the implied covenant of good faith and fair dealing.   These claims are pled as threadbare recitations—plaintiff does no more than make the above proclamations—and are wholly unsupported by factual basis.  See Port Dock, 507 F.3d at 121.  For example, plaintiff fails to allege what aspect of the KIKO transaction—or indeed which particular contract or contracts— is unconscionable.  Plaintiff does not provide any plausible theory or such a cause of action (for example, the SAC does not state whether the claim is on the basis of procedural or substantive unconscionability or both).  Similarly, plaintiff has not provided any basis for unilateral mistake;  the SAC does not even explain what the alleged mistake is.  Finally, the naked assertion that defendants breached the covenant of good faith and fair dealing is similarly unsupported by any factual basis.  Therefore, this claim cannot meet the Twombly / Iqbal pleading standard and must be dismissed.

IV.    CONCLUSION

Having found multiple bases for dismissal, the Court need not reach the remaining bases advanced by defendants. For the reasons set forth above, this action is dismissed. The Clerk of Court is directed to terminate the motion at ECF No. 95 and to terminate this action.

SO ORDERED.

Dated:        New York, New York
              August 3, 2016

_____
KATHERINE B. FORREST
United States District Judge